IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>WILLIAM FREDYRICK DAHN, a/k/a<br>WILLIAM FREDRICK DAHN,<br><br>Appellant. | No. 85896-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — William Dahn challenges the sufficiency of the evidence after his conviction at trial on four counts of animal cruelty in the first degree based on the deaths of birds that were removed from his home by animal control officers. We conclude that the evidence was sufficient to support the convictions and affirm.

FACTS

In late 2018, William Dahn was living in Roy, Washington, in a residential home that he was also operating as an aviary called Heartland Farms. On December 18 of that year, Dahn was taken to the hospital by emergency personnel and remained there for approximately three weeks. Prior to leaving for the hospital, he told his neighbor Greg Duckworth that he had been unable to care for his animals for three days as a result of a fall and requested that Greg take care of his animals while he was in the hospital, and Greg agreed.

The next day, Greg's wife Donna Duckworth[1] went to Dahn's house to attend to the animals. When she entered the house, she immediately noticed a strong smell and that the house was "not clean." Throughout the house, Duckworth observed birds in cages that were encrusted with feces and had dirty water dishes. She found that some birds had food and others did not. Duckworth spent the next hour going through each cage, changing the water and filling the food dishes. Concerned that the birds were not being properly cared for, she called Pierce County Animal Control (PCAC) on December 20. Duckworth continued caring for the birds by providing food and water until animal control officers responded a few days later.

On December 22, PCAC Officer[2] Jody Page responded to Duckworth's report about Dahn's house. Page was joined by two deputies from the Pierce County Sheriff's Department who were assigned to secure the house and two other PCAC officers, Brian Boman and Patrick Cassin. Despite noting conditions for the 47 birds located in Dahn's home that were serious enough to justify seizure of the animals, Page did not find any that were deceased. The PCAC officers were familiar with the potential health effects of stress on birds and weighed the risks of transporting them to another location.[3] Ultimately, arrangements were made to transport all of Dahn's birds that same day to the Rusty Bar Ranch (the Ranch), a facility PCAC contracted with that was experienced in caring for exotic birds.

---

[1] For clarity, because they share the same last name, we refer to Donna by her last name and Greg by his first name. No disrespect is intended.

[2] Page is now retired from the PCAC.

[3] Page testified that they "ha[d] to weigh the risks," and that "[h]ealth issues, the cold, the lack of hygiene" were risks to any birds remaining in the house. During testimony, Boman explained the relevant considerations for transport, noting "we have to look at what's in the best interests of the animal . . . we will transport when an animal needs to be removed from a condition."

At the Ranch, the birds were unloaded from their cages (mostly by Kathy Richardson, one of the owners of the Ranch) and placed in a large heated observation room. The PCAC officers spent approximately three hours cleaning the bird cages with a pressure washer and Richardson replaced the dirty food and water dishes with clean ones full of food and water. The next day, after checking on the birds and determining they were not in obvious distress, Richardson left to purchase supplies for the birds. When she returned about three hours later, she found dead birds in the cages. She testified a total of seven birds died, within the first three days. Almost immediately, Richardson wrapped the deceased birds in plastic bags and refrigerated them. She reported the deaths to PCAC, who later came to retrieve the bodies of the birds. Four birds were sent for examination.[4]

On December 29, 2018, the PCAC delivered four dead birds to Dr. Jennifer Ward, a veterinary pathologist, for necropsy.[5] Ward identified each of the deceased birds as a conure and, among other diagnoses, concluded that each showed evidence of marked, chronic emaciation. In January 2020, the State charged Dahn with four counts of animal cruelty in the first degree by way of starvation, dehydration, or suffocation pursuant to RCW 16.52.205. On October 28, 2022, the information was amended to include a summary of the coloring and/or markings of each bird for purposes of identification; all four were described therein as conures. The amended information also altered all four counts to charge

---

[4] The four sent for necropsy are the only birds referenced in the State's charges.
[5] In her trial testimony, Ward defined necropsy as a postmortem examination of an animal to determine the cause of its death, analogous to an autopsy for a human.

Dahn with animal cruelty in the first degree by criminal negligence in starving each of the four conures to death.

Dahn proceeded to trial in November 2022. The jury heard testimony from PCAC officers Page, Boman, and Cassin, as well as Richardson, the Ranch's other co-owner Raymond Strieck, Duckworth, veterinarians Dr. Bridget Ferguson and Ward, and Danielle Motzer, one of Dahn's former employees. Dahn also testified in his own defense. The jury found Dahn guilty on all four counts. The trial court imposed a standard range sentence of one year of community custody with a condition restricting his ability to access or care for animals, ordered the forfeiture of the surviving animals that were seized, and payment of restitution and legal financial obligations.

Dahn timely appealed.

ANALYSIS

Due process requires the State to prove each element of the charged offense beyond a reasonable doubt. *State v. Meza*, 22 Wn. App. 2d 514, 537, 512 P.3d 608 (2022). Evidence is sufficient if, after viewing the evidence in the light most favorable to the prosecution, "any rational fact-finder could have found the elements of the crime beyond a reasonable doubt." *State v. Stewart*, 12 Wn. App. 2d 236, 239, 457 P.3d 1213 (2020).

"Evidence sufficiency challenges admit the truth of the State's evidence and all reasonable inferences that can be drawn from it." *Id.* at 240. Credibility determinations are made by the trier of fact and, accordingly, we defer to the trial court on issues of conflicting evidence, witness credibility, and persuasiveness of

the evidence. *Id.; see, e.g., State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 216 (1980) (explaining the question is not whether reviewing court finds guilt beyond a reasonable doubt based on the evidence but whether any rational trier of fact could have); *State v. Bencivenga*, 137 Wn.2d 703, 709, 974 P.2d 832 (1999) (only fact finder may disregard theories it finds unreasonable, weigh evidence, and determine witness credibility); *State v. Johnson*, 159 Wn. App. 766, 774, 247 P.3d 11 (2011) (reviewing court not entitled to substitute its evaluation of evidence for that of the jury); *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) ("'Credibility determinations are for the trier of fact' and are not subject to review." (quoting *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990), *abrogated in part on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022))).

Thus, our review is "highly deferential to the jury's decision." *State v. Davis,* 182 Wn.2d 222, 227, 340 P.3d 820 (2014). However, evidence that is speculative and based on conjecture is "scintilla evidence" that, alone, cannot support a conviction. *See State v. Zamora*, 6 Wn. App. 130, 133-34, 491 P.2d 1342 (1971).

The State's amended information charged Dahn with four counts of animal cruelty in the first degree, asserting that he "did unlawfully, feloniously, and with criminal negligence starve a green sun conure . . . and, as a result, caused its death."[6] Accordingly, the State was required to prove beyond a reasonable doubt that Dahn acted with criminal negligence, that the birds died by starvation, and that

---

[6] Each count also included a physical description of each of the four birds, as did the corresponding jury instructions and verdict forms.

the deceased birds were conures. Dahn alleges that the State failed to do so on all three elements of each of the four counts.

I.      Evidence of Criminal Negligence

The State charged Dahn under RCW 16.52.205(2) which states that a person is guilty of animal cruelty in the first degree when that person,

> with criminal negligence, starves, dehydrates, or suffocates an animal, or exposes an animal to excessive heat or cold and as a result causes: (i) Substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering; or (ii) death.

RCW 16.52.205(2)(a). RCW 9A.08.010(1)(d) provides that a person is criminally negligent when they fail "to be aware of a substantial risk that a wrongful act may occur and [their] failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." Referencing the statute defining this particular mental state, Dahn argues that he was not negligent because he experienced an unexpected medical emergency that left him physically unable to care for his birds for three days.

This defense theory, that the medical episode undercut the State's proof on this element of the charges, was presented to the jury and challenged by the State. Dahn asserted that he suffered a fall on or about December 15, 2018 that immobilized him on his back on the floor of the kitchen for three days. He claims that, as a result of this incident and the injury he sustained, he was unable to reach a phone to call emergency services until December 18. Dahn testified that the doctors who treated him "didn't have any clue" what caused his collapse and that he had never experienced a similar episode before. The only information

presented to the jury about this incident was Dahn's own testimony of what occurred.

However, as the State points out, even assuming the medical episode occurred exactly as Dahn described and he was unable to care for his birds for three days, a rational trier of fact could have found, based on the evidence before them, that those three days alone could not have caused the conditions that resulted in the birds' deaths. When PCAC officers arrived at Dahn's home, Cassin began sketching an incident diagram of the layout of the house while Boman and Page took photographs. Page noted that there were 47 birds in the house, including conures, Amazon parrots, and macaws. She described the house as being cold and cluttered with "mothballs everywhere."[7] Page observed that the food dishes were full of mold and feces, and several birds did not have water. She further noted that "the floors of the cages had caked-on feces that had been there for a while"[8] and mold was growing in the cages. Boman described seeing "mounds of feces" in the cages, and Cassin described observing both feces and bird dander covering the cages. Motzer testified that she observed similar conditions in Dahn's home in October 2018 after responding to Dahn's advertisement for a helper to care for the birds. More critically, Ward described the emaciation she detected in the birds as "chronic," and explained that she used that term to mean that it had been ongoing for weeks or months, which was

---

[7] All three PCAC officers and Duckworth testified to a strong scent of mothballs throughout the home. Additionally, Ferguson testified that birds are particularly sensitive to aerosolized pollution and she would not recommend having mothballs near birds because they are a toxin.

[8] The defense objected to this testimony at trial, arguing that it was speculative, but the judge overruled the objection.

corroborated by Motzer's testimony about her observations roughly two months before the incident that resulted PCAC's seizure and investigation.

The State juxtaposed these conditions with the expected standard of care for a bird owner; likely, at least in part, as a response to Dahn's testimony that he had previously owned a pet store that sold birds in Tacoma for 23 years and had been breeding birds since the mid-1980s. Page described not only her training and role as an animal control officer but also that, like Dahn, she had personal experience with conures, and characterized the living conditions of the birds she observed in Dahn's home as "filthy." Ferguson explained the importance of frequent cage cleaning to prevent bacterial infections. Duckworth, Richardson, and Motzer all also stated they had previously or currently owned exotic birds and, like Page, described the living conditions of Dahn's birds with disapproval. Based on this evidence, a rational trier of fact could have reasonably found both that the State established the standard of care and that Dahn did not meet that standard to the point that he acted in a criminally negligent manner with regard to the four birds at issue here. Further, Ward and Motzer's testimony supports a reasonable inference that the findings from the necropsies that the birds suffered from emaciation and muscle atrophy as a result of a period of neglect that, contrary to Dahn's defense theory, far exceeded the three days he was incapacitated as a result of a medical episode.

II.    Evidence Birds Died by Starvation

Next, Dahn asserts that, even if his conduct could be considered criminally negligent, the State failed to prove that the birds died from starvation rather than

the stress of being relocated. He also challenges the reliability of the necropsies because they were performed 8-9 days after death rather than within 24 hours, as Ferguson testified was necessary for useful results.

Although Ferguson did testify that a necropsy on a bird should be performed within 24 hours, Ward, a specialist in veterinary pathology who has been performing necropsies for almost 20 years, testified that there were many variables to the preservation of a body and that smaller birds in particular can "keep for days, even weeks" if refrigerated quickly after death. Richardson testified that she "almost immediately" wrapped the deceased birds in plastic bags and placed them in the refrigerator after discovering they had died. Whether the necropsies were performed under valid conditions, and therefore the results were reliable, was a question of fact decided by the jury after hearing the testimony of the experts. The verdicts demonstrate that the jury reasonably found Ward's testimony to be persuasive on this point. Again, we will not reweigh the evidence or the credibility determinations of the jury. *See Johnson*, 159 Wn. App. at 774*; Cardenas-Flores*, 189 Wn.2d at 266.

As to the main focus of this assignment of error, the State presented a significant amount of evidence that the birds had died of starvation, to the exclusion of other possible causes of death, such as stress from transport. When PCAC transported the birds to the Ranch, they enlisted the help of Richardson, who had personal experience in handling exotic birds. Richardson explained at trial that she assisted in moving the smaller birds into the PCAC carriers, which were then

placed in the heated cab of Page's truck.[9] These measures were taken after the PCAC officers had weighed the risks of transporting the birds at all. Both Ward and Ferguson acknowledged that moving a bird to a new environment can be stressful and, depending on the condition and age of the particular bird, stress can be detrimental to the overall health of the animal. Page and Richardson also acknowledged that stress can be detrimental to birds. But, Ferguson also testified that the potential stress of moving and handling the birds "should not be fatal unless there's an underlying health problem."

Ward, who performed necropsies on all four of the birds, including examining the muscle tissue on a microscopic level, testified that she "did not find anything else that would explain" how the birds became so emaciated other than starvation. She detailed how the extreme degree of muscle atrophy and loss of fat tissue in the birds could not be explained by a lack of exercise. Again, when asked what she meant by her diagnosis of "chronic" emaciation, Ward testified that she meant the starvation "was going on for weeks to months" and that it "would not happen in a short period of time."

Page and Richardson, both of whom had previously owned exotic birds and were familiar with their care, testified to conditions indicative of starvation. Page attested that the food dishes "had caked-on feces" and mold. Richardson submitted that the "majority of the food did have feces, some of it had mold." Cassin also testified to seeing mold in the food dishes. Motzer testified that similar conditions were present months before the birds were seized. Duckworth testified

---

[9] The larger birds were placed in a heated horse trailer in either their original cages or in cages borrowed from the Ranch.

- 10 -

that some birds had food in their cages and others did not. Viewing the testimony of all of these witnesses in the light most favorable to the State, there was sufficient evidence to support a rational trier of fact in finding beyond a reasonable doubt that the birds died by starvation.

III.     Evidence Animals Were Conures

Finally, Dahn argues that the evidence was insufficient to prove that the deceased birds were conures. Specifically, he avers that there is "more than a 'mere scintilla of evidence' indicating the birds . . . were *not* [c]onures." His framing of the argument on this issue demonstrates that Dahn misunderstands the test this court utilizes to assess a sufficiency of the evidence challenge. As we have established, we do not reweigh evidence presented to the trial court or otherwise resolve competing evidence. *See Green*, 94 Wn.2d at 221; *Bencivenga*, 137 Wn.2d at 709; *Johnson*, 159 Wn. App. at 774; *Cardenas-Flores*, 189 Wn.2d at 266.

Richardson, who testified that she had extensive experience with exotic birds, asserted that the dead birds were "psittaculas" and not conures. Dahn also testified that he had two conures, not four. However, Ferguson, a veterinarian who has been treating birds for approximately 25 years, testified that the term "psittacine" is a term that is "synonymous with parrot," and the parrot family includes conures. She also provided a general physical description of conures that was similar to the birds Ward described receiving for necropsy.

Ward stated that each of the four birds submitted by PCAC was identified as a conure and that part of her process in performing a necropsy includes confirming that the information submitted with the animal is correct. Although she

testified that she looks at the species identification submitted with the sample, she also affirmed that each of her reports was based on her own "individual findings" and that she was able to confirm the species identification based on her own observations. Ward affirmatively testified, "I believe they were green [c]onures," in response to questioning about what type of birds she received on December 28, 2018 for necropsy. Finally, Dahn's former employee, Motzer, testified as a State's witness and explained that some of the birds she saw in Dahn's home were conure-like. Taken together and viewed in the light most favorable to the State, sufficient evidence was presented that could persuade a rational trier of fact that the deceased birds were conures.

Although reasonable minds could differ on how to evaluate this conflicting testimony, the outcome of the trial ultimately rests on credibility determinations, which may only by decided by the jury. The verdicts establish that the jury credited the conclusions of veterinary experts Ferguson and Ward over the contrary assertions of lay witnesses on the issue of whether the birds were conures, and believed that the birds died as a result of starvation and that Dahn failed to meet the standard of care for the birds such that he was criminally negligent.

Affirmed.

WE CONCUR:

Hazelrigg, A.C.J.

Birk, J.

Coburn, J.

- 12 -